Number 20-13367 Michael Dasher et al. v. RBC Bank Mr. Klor, whenever you're ready. Morning again. I'm Robert Klor for the appellant Stephanie Avery. This appeal, from my perspective, is one that is complicated on the facts but relatively straightforward on the law. I'm hoping to avoid the minutiae of the facts, but I'm sure we'll get into some of that. The synopsis is there's a fundamental inter-class conflict based on disparate arbitration rights and a class action waiver. The material facts, as I see them, are, of course, this is a class action, it involves the RBC imposing overdraft fees in a high-to-low sequence, and it's part of a much larger MDL in which there have been in excess of 20 settlements for hundreds of millions of dollars and hundreds of millions in attorney's fees. Fast forward to 2014, class counsel flagged the very conflict that is the subject of this appeal by proposing subclasses in a first-amended complaint involving the disparate arbitration rights. If I can just briefly summarize the two groups that are at issue here. One group is approximately 17,000 class members, of which my client Stephanie Avery is one, and those class members, according to the party's own arguments, are indisputably not subject to arbitration, and that is because they closed their account before PNC, which is a February 1, 2013, amendment. So they're indisputably not subject to arbitration. Meanwhile, the remainder of the class members, which total around 134,000, not only are potentially subject to arbitration, but to a class action waiver, which would be dispositive of the class's claims.  No, no, you, please. So a legal question, just to get to what, for me, is the nub of this thing. So the fundamental conflict that you allege is about the value of claims, right? The practical walking-around sense value of claims, those that are subject to arbitration are going to be worth less than those that are not subject to arbitration. Because the standard of review that you've got to contend with is abuse of discretion, and I think that it would behoove you to, like, put your finger on some error of law that the district court made. Is there, like, a, is there a holding or a principle arising out of Amchem or Ortiz or something that says that one of these, what I'll call a value conflict, defeats adequacy? I think the Ortiz opinion, so Amchem, of course, involved present versus future in the conflict between those groups. Ortiz addresses that as well, but then also addresses the second conflict, which is the difference in value and claims. And in Ortiz, the issue was one group had access to greater insurance proceeds. And so, at least in our logic, that follows the same analysis as we have here, where we have class counsel's expert has assigned value based on whether arbitration has been invoked or not. And based on those numbers, it's easy to see that the group of 17,000 class members have claims that are more than twice as valuable. So let me ask you this. I mean, and I say this with all due affection, having clerked for the guy, but Justice Souter's opinion in Ortiz is kind of hard, it's hard to make sense of, because I can't quite tell if this value conflict issue that he notes in Ortiz about the insurance coverage expiring in 1959, if that's, like, an independent condition or it's, like, just sort of part of the gestalt of the analysis in Ortiz. I mean, I take it your position is that Ortiz sets up an independent condition, that if there is a value conflict like this, as a per se matter, there have to be subclasses. That's correct. That's how I would read the opinion. But I take your point, it is, the opinion is kind of murky in that respect. Now let me ask you something sort of related. So let's assume that you're right, that this sort of conflict has to be addressed, generally speaking, when you've got some people subject to an arbitration provision, or at least potentially subject to it, and others who clearly are not subject to it, okay? I take that as a given. You said the facts here were a little messy, and I agree, I agree with you. And so let's talk about a couple of those messy facts, right? And I don't know which way they pull, and that's why I want to ask you, and I'll ask your colleagues on the other side, too. By the time the settlement occurs, and is approved by the district court, this court has twice rejected arbitration claims by the defendants, right? And for settlement purposes, the defendants have agreed not to invoke the arbitration provisions. So tell me how those messy facts play into the notion that normally that conflict creates a need for a subclass. Because if you've already got an appellate court, and I get it that they were specific arguments made, and we can't really read beyond that, but you've had two arbitration claims, two arbitration appeals, by defendants rejected. One in 2014, and one in 2018. The first one called Dasher, and the second one called Dasher II. Both of them began with RBC Bank, sorry about that. So both published opinions, and then the defendants say, we're not going, for purpose of settlement, we're not going to invoke our rights under the arbitration provisions for those claims. How do those play into an abuse of discretion standard? Let me start with the second question first. So the waiver of the arbitration, I think that's, you have to throw that out, because the question is, when is, is there a conflict when you're sitting down at the bargaining table? That's the relevant point in time. If there's a conflict, and that's what Amkim and Ortiz talk about, is you have to have someone who would, who's not just thinking about the group as a whole, but someone who's thinking about the group that have stronger claims. And so to say, oh, well, if you don't have, you don't have that person there at the table, and then say, oh, well, let's just cast that aside, and we can waive arbitration, and everything's fine. No, that's not, that's the opposite approach that you have to take under Rule 23A. So that's my answer to that, the second question. So what, I'm sorry to interrupt your answer to the second question, but in that scenario, what if, if there are subclasses, then there are settlements potentially available for the subclasses. So what happens if your subclass doesn't get a settlement, then you've got to go to trial? How does that impact the analysis? I don't think . . . The defendants say, listen, we're waiving our arbitration rights, and as to the 134,000, the big group, we're able to come to an agreement, we put it before the judge, there's a fairness hearing, the settlement gets approved, or whatever. But you say, my sub, let's say you're class counsel for the subclass, right, from Ms. Avery. And you say, no, no, no, you guys settled for, you know, X amount on the dollar with them, uh-uh, you've got to triple that for us. They're like, no game, we're going to trial. Yeah, that's, I mean, that's a potential outcome. But that's, I mean, that's essentially what we're saying should happen, is . . . So why not opt out? Well . . . And go to trial. Right, but, I mean, I don't think we're . . . our decision is not between opting out and . . . I know it's not. Right, right. I'm not suggesting waiver or anything improper, nothing, nothing. I'm just saying, if that's your view of the world, why not opt out and take them to trial for the higher value? Or why not sue them for your own subclass and settle with them? If you think you can settle with them, why not do that? Yeah, well, all I can say on that is Ms. Avery chose to object rather than opting out, so . . . That was her right, and I'm not suggesting that was unavailable to her or improper in any way. Okay, thank you. And so, you're going to have to remind me of the initial question I have for you guys. The first one was the two opinions from here, rejecting some arbitration claims by the defendants, which I think, in the world of litigation, in terms of analyzing risk, that puts them, the defendants, in a slightly worse position, right? It doesn't lock everything out, doesn't knock everything out, but you've got two Eleventh Circuit published opinions saying no arbitration, no arbitration. And that puts their arbitration position in a little bit of a weaker state, I would think. Right. A couple of responses, I think . . . I want to know how that works into the abuse of discretion standard. So, number one, I think you don't look to the . . . According to the cases that have dealt with the Rule 23 adequacy analysis, you don't actually delve into the merits of the . . . whether there actually would be . . . you would actually compel arbitration, you don't actually delve into the merits. I think it's fair to consider those risks, but the other point is that neither of those two opinions address the particular arbitration provision to which the 134,000 class members are subject to. I know, I understand . . . Right, right. That's why I said they're not . . . Right. They don't knock everything out of the water, but there's some language in there that a skillful defense lawyer would say is very helpful to . . . a skillful plaintiff's lawyer would say is very helpful to their position in fighting the different arbitrations. Okay. Well, I think that's fair. We've taken you way over with questions, so I want to give you a couple of minutes to make the argument you wanted to make before we interrupted. Okay. So, we've discussed Amkin and Ortiz pretty thoroughly. The jurist versus intimate opinion from this court, I think it's important to discuss because it potentially cuts against our argument and that the court said, okay, well, there's no per se requirement of subclassing and separate representation. You just have to make sure that you observe the structural assurances of due process. And the court said in that particular case, there was what it deemed the functional equivalent of subclassing, which was separate counsel at the bargaining table advocating only for that minority group's interests. That's what was missing here. So, there was just a single representative at the bargaining table. Ms. Avery was not a part of the bargaining at the outset. She was not there when class counsel and Dasher reached the summary agreement. She only learned about it after the fact. So, is your argument that she has to have a place at the table or there has to be a subclass created? There has to be somebody. Well, no, argument is there has to be a subclass representing that group. So, being at the table wouldn't solve the problem? Well, some representative on behalf of that group should have been at the table. Right, but without a subclass, that's sort of ephemeral because if they just look at you and say, we disagree with you, going forward with our settlement, it doesn't do you any good. That's true. But I was just pointing out the jurist versus intimate. And in that case, this court said, well, although there wasn't subclassing, there was the functional equivalent of it because they provided separate counsel that was there at the bargaining table advocating solely on behalf of that minority group's interests. Okay, Mr. Clorey, thank you very much. You've saved your full time for rebuttal. Mr. Streisfeld. Good morning and may it please the court. My name is Jonathan Streisfeld. I'm one of the class counsel representing the settlement class in this case. And with me today is Mr. Yonella, who represents RBC Bank. I'm going to make the primary arguments on behalf of the parties to the action in terms of the support for the settlement and the fact that there was no abuse of discretion. Mr. Yonella is available to answer some questions for the court should the court have those. So right off the bat, there was no error of judgment here by Judge King in evaluating adequacy and typicality in the context of what the panel here today has said is a somewhat messy set of facts. Here we had a case that from the outset, every one of the putative class members and the two class representatives and the two lawsuits that were filed were subject to the same arbitration defense that RBC had. We had ten years of hard-fought litigation before this settlement occurred. Judge Jordan, you pointed out that there were two published decisions in this case, both in favor of the plaintiffs, saying that these two class representatives were not subject to arbitration. So a single member of this 152,000 or so member class asserted an objection. There was a pro se objector, but that objector is not here today. I did not appeal the final approval. With a $7.5 million common fund settlement, 23% of the value of the damage is as we see it for all RBC account holders who are included in the class. Assuming that everybody in the class puts in and you've deducted class counsel fees, what's the approximate pro rata distribution? Well, I can't give you- You can't give me numbers, exact numbers. Well, part of the reason, Judge Jordan, that I paused and I said that I can't give you exact numbers and I don't have the spread from the lowest to the highest, but this is not a situation where everybody's getting one overdraft fee back and as a result of that, you take out class counsel's percentage of attorney's fees and the cost and things like that. If Ms. Avery, for example, had $100 in overdraft fee harm and Mr. Dasher had $200 in overdraft fee harm, and I don't remember exactly the facts as to how that worked between the two or if you took a third person, Mr. Streisfeld, and he had $500. Well, Mr. Streisfeld would get a greater percentage because the pro rata was based upon a formula based upon the harm associated with number of overdraft fees. So the more overdraft harm in your wars that you suffered, the higher the pro rata distribution to you, generally speaking? That's my recollection, Your Honor. So we reached this settlement and there's actually a 13-month period of time between the moment that we announced the settlement and the time that Ms. Avery ever objected in any way formally to adequacy or typicality. Filed a notice of settlement. She and her private counsel, who's the one who filed her case in North Carolina, who MDL counsel, including myself, dealt with, did not do anything to say stop. So is your point now that she somehow has stopped or barred? If not, then let's just move on. Okay. I'm not saying that she's a stop. Her objection is timely. The panel made the point today that she did come in. Maybe, Judge Jordan, you said you weren't suggesting to Mr. Klor that she had an untimely objection. Her objection was timely in the technical sense, like any other class member's objection. But she didn't stand up and say, deny the motion for preliminary approval. There isn't enough here, Judge King, to preliminarily approve this under the 2018 amended version of Rule 23E. So there's none of that. She didn't opt out. She could have opted out, Judge Jordan. She decided at the very last minute, day before the deadline for objections, to assert this objection. Mr. Klor was not her counsel at the time. And the prism of this case is that there was always really one class. And there were changes and machinations that happened from the plaintiff's perspective to deal with RBC's vehement effort to enforce arbitration against the class reps and intention to do so against every RBC account holder. But is there any – I think I took away from the briefing. Mr. Klor said he used the adverb indisputably, that there is a group of people who are indisputably not subject to arbitration. I think I recall from the briefing that you said, no, no, no, that's not true, actually. But, I mean, is there a dispute that there are some people, some people within the Avery class who are not subject to arbitration, that there is this window? So the Avery class, as it was pled, when we were responding to the first situation being Dasher 1 and RBC's intention to move yet again as to Mr. Dasher because he remained a customer of RBC Bank, the Avery class actually, as drafted, was to include everybody but the people that remained at PNC, which was far greater than just the 17,000 group that Mr. Klor and Ms. Avery are attempting to say are on their own and should be on their own. I'm just trying to figure out whether or not there is within this ginormous group of people some subclass of people for whom arbitration is not an obstacle. Because, I mean, here's the thing. That's the nub of the whole thing. There either is this cleavage within the class, the larger class, or there's not. And so are there some people in this ginormous class that aren't subject to arbitration or not? There are arguably people that would benefit from the victory that Ms. Avery got as not being bound by arbitration because the PNC agreement superseded the RBC agreement. But from an abuse of discretion standard, I don't think that there's an error in judgment under either adequacy or typicality. Is there an error of law, right? I mean, everybody knows that an error of law is per se an abuse of discretion. So is there an error of law either arising out of Ortiz or otherwise that because there is this what I've called a value conflict that you had to have subclasses? Does Ortiz teach that, basically? I've read it obviously a number of times in getting ready for today. I view the case still as addressing abuse of discretion. In that particular case, that mass tort case, whether it's Ortiz or Amchem being mass tort cases as opposed to a normal class action, as I would call this, with everybody having the same exact objective is to get those overdraft fees, whether it was $500 or $200 or $100. And now we have this procedural forum issue that is being inserted by a defendant at the beginning of the case that applied to everybody. How is that really different from Ortiz? I mean, in Ortiz, everybody had suffered the same injury. Well, let me pause. Okay, so if Ortiz says two things. One, we've got past and future injuries like in Amchem. Bracket that. Second, Ortiz says there's this issue, this 1959 issue about when the insurance expired. The extent that Ortiz has properly read to put some real weight on that second condition, how is that really different from this? I mean, what Ortiz seems to be saying is the claims as a legal matter, as an analytical matter, they're all, like, worth the same thing. But we know because we live in the real world that once insurance expires, the claim loses some value because there's going to be nobody to pay it. And so why isn't that really different from here? Or why is that different from here? Well, in that particular case, you were looking at the potential differences in the claims, and I do want to talk to you about our disagreement about that the value was so certainly different between the two groups. But none of the cases that the Court's been presented with, whether it's Amchem or Ortiz or these Ninth Circuit cases that Ms. Avery has used in her brief, address what are we supposed to do when we have this arbitration issue. The way it was presented, I'll use again on these messy facts, whether that prevented Mr. Dasher from being an adequate class representative, whether it prevented class counsel from being adequate to do the negotiations on behalf of everyone that had been harmed, and it doesn't address the issue of how typicality should be considered. So I don't think we specifically have a case that comes out of that and that we have anything that says that this was the type of fundamental conflict that required subclassing in order to do the negotiation. Can you remind me, and I'm sorry I just can't remember as I'm sitting here, whose expert it was that said typically, as a general matter, on average, claims that are subject to arbitration settle for $0.20 on the dollar, whereas claims that are not subject to arbitration settle for $0.46. Professor Fitzpatrick was the expert in support of our final approval motion. He was your expert. He was our expert, but not an expert in the sense of trying to analyze the value and create this issue that's been raised by the objection. Do you dispute his empirical, descriptive claim that $0.46 and $0.20 are about the right numbers? I think each one of these cases, this was an interesting MDL from the perspective that we didn't have, let's say, everybody ganging up on one defendant bank and there were lawsuits filed in Texas and in Missouri and Florida and California and everything was brought together. In 2009, Judge King was directed to preside over an overdraft MDL, which wound up being dozens of individual bank cases. In those individual bank cases, settlements went in different ways. Professor Fitzpatrick was saying there is this continuum, and so the 23% that we recovered fell within the continuum of reasonable recovery. Bank of America had no arbitration provision at all, still doesn't have an arbitration provision. It settled for a percentage far lower than the percentage because it chose not to litigate and there were different factors in that case. We don't know here, Mr. Klor, there was no developed record in this case as part of the objection to say, why is this case for certain more valuable than the other case? Well, I guess the reason I ask is that at least a plausible reading, I think maybe even the better reading of Ortiz is that this value conflict problem does present like an independent, potentially an independent conflict that might warrant subclassing. And then when you look at the specifics of this case, your expert says on average claims that are subject to arbitration just are worth less than half as much as claims that aren't subject to arbitration. And so I guess Mr. Klor's point is going to be like, see, what Ortiz said about this value conflict actually materializes in the real world, so says their expert. So we need some help at the bargaining table, as he would say. So if we talk about the abusive discretion standard and we look at that from the perspective of what the facts that Judge King was presented with, certainly another judge might go a different way. Another judge might say that there should be subclasses. But in this particular case, I think everything else but for putting this arbitration defense that applied to everybody from the outset in the mix, Mr. Dasher was adequate and typical. He suffered the same exact injury, the same claim, the same defenses. He had the same objectives, the same motivations to protect the class. And I'd ask you to go ahead. You mentioned the Bank of America settlement. Were all those other settlements part of the record here or discussed by Professor Fitzpatrick in laying out? And it's one thing, I think, that claims subject or potentially subject to arbitration provision are less valuable than those that are not. But I would think that if you have hard, concrete data of what had happened in this MDL with regards to different banks, that may also be an important fact. So is this Bank of America settlement in the record, noticed by anybody, brought to anybody's attention? So it's part of the table in Mr. Fitzpatrick's, Professor Fitzpatrick's declaration. It's document 4429-3. It is in the record. And I see that I'm over with my time. So on behalf of the settlement class, we'd ask that the court affirm, concluding that there was no error in judgment sufficient to say that Judge King abused his discretion as to either typicality or adequacy. Thank you. Thank you very much, Mr. Yonella. Two minutes to walk into the hornet's nest. I'm going to try to be as quiet as possible. May it please the court, Phil Yonella on behalf of RBC Bank. I will be brief this morning. RBC does not take any position with regard to the question of whether there is an intra-class conflict between the Avery class and the Dasher class. We are only here today to try to set the record straight on some facts. I think there have been some misstatements and omissions by Avery's counsel in the underlying briefing, some of which I believe the court has picked up on during the prior questioning. The first issue that I was going to talk about is that the Avery class, I heard Mr. Klor say this earlier, he said in his briefing, he said that the Avery class is not subject to arbitration. That is not accurate. There are members of the Avery class who are subject to arbitration. But to my point earlier, you don't dispute that there are some people in the global settlement who are not? The record establishes that there are 17,412 former RBC bank holders who became PNC customers, and that would have been in March of 2012. But they closed their accounts before February 1st of 2013, which is when PNC instituted an arbitration clause with class action. That little group has been . . . It is not subject to the RBC arbitration agreement because they were no longer RBC. And then the PNC agreement didn't come into place until February 1st of 2013. And I believe this is an issue before that was essentially resolved both by the district court and the 11th Circuit in the 2014 rule. So we have not taken any position as to the arbitrability of that particular subgroup. Our only point is that a position we have taken and will continue to take if this litigation continues is that there is another group, those former RBC customers who never became PNC customers that are subject to arbitration under the RBC agreement. So the second point I want to make, and this has not really been addressed at all, is that even among that small group, that 17,412, RBC had numerous objections to the certification of that class as well as Ms. Avery's ability to serve as a class representative for that class. Just putting arbitration aside, there's a lot of problems with that class that they were not resolved below. One big issue is the fact that Ms. Avery is from North Carolina. She purported to represent a class of former RBC account holders from five other states. Our position is that she does not have standing to represent that class. We've made all these arguments previously, but I just want the court to be aware that arbitration is not the sole issue here that goes into calculating sort of the cost or the value of not having an arbitration clause. There are many other legal issues that were never resolved. And my last point is simply a historical one. I think the court is aware this is our fourth trip to the Eleventh Circuit. This litigation began in 2010. This settlement put to end a decade's worth of litigation and helped to avoid almost certain litigation over these many outstanding arbitration and certification issues that have not yet been resolved. This was a fair and adequate settlement, in our view, reached by experienced class counsel as well as RBC's in-house counsel. And we'd ask the court to affirm the settlement. All right. Thank you very much. You've got your five minutes of rebuttal, Mr. Perry. Thank you. I'll just start when I get this on. So I understand that this is a long-winded or this process has been going on for ten years, but it's important that we recognize Amchem and Ortiz because the class action device is the exception to the rule that you typically have someone advocating on your own individual behalf. When you aggregate claims in the class action, it's critical that if there's a minority group that has fundamentally different interests, such as when, as Judge Newman, as you put it, there's a value conflict, it's critical that those members have a representative advocating on only their behalf. We have Professor Fitzpatrick's report, which lays out the general disparity of how these are valued between plaintiffs who are subject to an arbitration provision and those who are not. I haven't gone into the record, so I'm taking what Mr. Streisfeld said at face value, that there are other settlements within this MDL with banks without an arbitration provision that settled for even less than the settlement here on a pro rata basis. So how do we, same question I asked him, how do we take that into account in a use of discretion scenario? Fitzpatrick's report was studying the settlements in this MDL. That's where the data comes from. So it's not just a general concept. He's speaking to this MDL and that the settlements, when arbitration wasn't invoked, his data establishes that the settlements are more than twice as valuable. I know, but obviously from the way you two gentlemen have described it, I presume that his 20 and 46 were averages. Right, of course they're outliers. So my question, it's not a point, it's a question, is if there are settlements below the arbitration provision number, below the 20, and those include scenarios where there was no arbitration provision, how do we factor that in? Well, I think if there is one, it's one. It's the real outlier in the list. How do we factor that in? I think you look at the broader concept of when arbitration is invoked in general, or in the vast majority of cases, it's not just a little bit more valuable, it's substantially more valuable to such an extent that that was the number one factor driving settlement value according to their own expert. I guess, so I don't mean to put words in Judge Jordan's mouth, but I have the same question. The flip side, the difficulty for the other side, I think, is 40s plus 46 versus 20. Those are pretty compelling factors on your side of this equation. The difficulty for you, I think, is abusive discretion, and the fact that 46 versus 20 is an average, and you've got settlements within this same MDL that came out sort of the other way, so to speak. So why wouldn't the district court have been within its discretion to say like, well, you know, 46 and 20, those are averages, but there's lots more going on, and it's sort of speculative to think that in every single case, this sort of value conflict is going to create a fundamental conflict that requires subclass. Well, a couple of factors. Number one, this is not just an arbitration provision, but a class action waiver, which is fundamentally dispositive of the class's claims, and although there isn't any circuit authority on the issue, we cited the Avila's opinion from the Ninth Circuit, and that is the only circuit court authority, and they said, yes, this is, this does rise to the level of a fundamental conflict that invokes AMKIM's structural, the requirements of structural assurance. And so our view is that it is an error of law, such that it would be an abusive discretion, and further, class counsel, this is not some just vague conflict. But class counsel identified it and proposed, they included it, this, they separated the groups initially in the class action complaint, and then only when presented with a $7.5 million settlement did they agree to scrap the subclassing and go with unitary representation and pro-rata distribution, and leaving the minority of 17,412 members to subsidize the settlement for the remaining class members who potentially were out. All right, Mr. Flory, thank you very much. Thank you very much. We really appreciate it. Thank you.